**Douglas P. GUSTAFSON, Appellant,**

v.

**STATE of Alaska, Appellee.**

**No. A–4162.**

Court of Appeals of Alaska.

June 18, 1993.

---

James H. McComas, Schleuss & McComas, Anchorage, for appellant.

John A. Scukanec, Asst. Atty. Gen., Office of Special Prosecutions and Appeals, Anchorage, and Charles E. Cole, Atty. Gen., Juneau, for appellee.

Before BRYNER, C.J., and COATS and MANNHEIMER, JJ.

## OPINION

MANNHEIMER, Judge.

Douglas P. Gustafson was convicted of second-degree murder, AS 11.41.110(a)(2), and tampering with physical evidence, AS 11.56.610(a)(1), following a jury trial in the Anchorage superior court. Superior Court Judge Karl S. Johnstone sentenced Gustafson to 65 years' imprisonment for the murder and a concurrent 2 years for tampering with evidence. Gustafson appeals his murder conviction and his murder sentence. We affirm Gustafson's conviction and sentence, but we remand to the superior court to correct a defect in the written judgement.

### The Shooting

On the evening of October 19, 1990, Gustafson and two friends, George Kerr and Raymond Cheely, were driving from Eagle River to Anchorage along the Glenn Highway. Gustafson had purchased an HK–91 rifle earlier that day, and the three young men had been target practicing at the Eklutna gravel pit. Cheely was driving Gustafson's car; Gustafson sat in the passenger's seat beside him, holding the rifle, while Kerr sat in the back seat.

As they were driving, Cheely thought that the driver of a red Toyota had tried to rub up against their car. Cheely and Gustafson decided to shoot at the Toyota. Cheely maneuvered Gustafson's car to allow Gustafson a clear shot, while Gustafson rolled down his window and rested the HK–91 on the ledge.

The Toyota had two occupants: the driver, Robert Chamberlain, and a passenger, Jeffery Cain. Unaware of what was about to happen, Chamberlain prepared to leave the highway at the Muldoon Avenue exit. As Chamberlain slowed down to negotiate the exit ramp, Gustafson fired his rifle at the car. The bullet went through the Toyota's rear window and penetrated Jeffery Cain's skull, killing him instantly.

The next morning, Cheely and Gustafson learned from news reports that the passenger of the Toyota had been killed. They contacted Kerr and advised him to keep quiet, telling him that they had already disposed of the HK–91 rifle. Nevertheless, Kerr told his employer that he had witnessed the shooting. The employer obtained an attorney for Kerr, and, acting on this attorney's advice, Kerr went to the police on the afternoon of October 20 and told them what he knew about the shooting.

### Gustafson's Motion to Suppress the Glass Warrant

In addition to providing the police with a statement, Kerr agreed to wear electronic monitoring equipment and engage Cheely and Gustafson in conversation about the shooting. Pursuant to *State v. Glass*, 583 P.2d 872 (Alaska 1978), the district attorney's office applied for warrants to authorize this monitoring.

At the warrant application hearing, a police officer testified about Kerr's statements as well as other information the police had gathered during their investigation. The officer also informed the magistrate that Kerr had no criminal record aside from one speeding ticket and a dismissed 1990 disorderly conduct charge. The magistrate then asked if Kerr had either sought or been offered any concession (*e.g.*, a promise of immunity or leniency) in exchange for the information he had given the police; the prosecuting attorney told the court that Kerr had not sought or received any concession. The magistrate then asked what had motivated Kerr to aid the police; the prosecutor stated that Kerr had agreed to help the police both because he thought it was the right thing to do and because he had concerns about his personal safety. The magistrate issued the requested *Glass* warrants. At the prompting of the prosecutor, the magistrate specifically found that Kerr was a "citizen informant" for *Aguilar/Spinelli* purposes.[1]

While the government was securing the *Glass* warrants, Kerr called his father to explain that he was helping the police in

---

1. See *Spinelli v. United States*, 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969); *Aguilar v. Texas*, 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964).

their investigation of the shooting. Over the telephone, Kerr told his father that he intended to engage Gustafson in a conversation that would be recorded by the police. Unknown to Kerr, Cheely was in Kerr's father's home during this conversation. Kerr's father later told the police that, when the telephone conversation ended, Cheely had asked him about the conversation. Suspecting that Cheely might also be involved, Kerr's father falsely told Cheely that Kerr was in Anchorage with his girlfriend. However, after Cheely left, Kerr's father called back to tell the police that he thought Cheely knew or at least suspected that Kerr was helping the authorities.

The police first made several attempts to locate Cheely, but they were unsuccessful. The police then turned their attention to Gustafson, who worked at the Anchorage International Airport.

A police investigator and an assistant district attorney drove Kerr to the airport so that they could execute the *Glass* warrant on Gustafson. As they approached their destination, Kerr asked what would happen if his conversation with Gustafson revealed that they had stolen some property. Kerr then disclosed that, the week before, he and Gustafson and Cheely had burglarized a meat market in Eagle River, stealing about $19,000 in cash. Kerr said that he was informing the authorities of this crime because he realized that it might come up during his conversation with Gustafson.

At this point, the police car was about to arrive at the airport. The assistant district attorney decided that, given the possibility that Cheely might be aware of Kerr's decision to aid the police and might be attempting to contact Gustafson, it was in the government's interest to grant Kerr immunity for the burglary and theft rather than delay or abandon the attempt to execute the *Glass* warrant. The prosecutor told Kerr that, if this was indeed all that Kerr had failed to reveal, the government would not prosecute him for the burglary/theft.

Kerr then got out of the car and walked into the airport to find Gustafson. During the ensuing monitored conversation, Gus-

tafson told Kerr that the HK–91 rifle was hidden in the shipyard and railroad area below downtown Anchorage, and that Gustafson intended either to substantially modify or destroy the weapon to frustrate any potential prosecution for the shooting. Following this conversation, Kerr left the airport and the police picked him up to re-interview him. About three hours later, Kerr engaged Gustafson in another monitored conversation; this second conversation occurred in the airport parking lot as Gustafson was walking to his car after work.

Following his indictment, Gustafson asked the superior court to suppress all evidence obtained under the *Glass* warrant. Gustafson contended that, after Kerr's confession to the burglary and theft, the authorities knew or should have known that Kerr was no longer a citizen informant. Gustafson argued that the police and prosecutor, once they received this information, were obligated to desist from attempting to execute the *Glass* warrant and were instead obligated to return immediately to the magistrate who issued the warrant and inform him of this new information, so that the magistrate could re-evaluate his decision to issue the warrant.

The prosecutor responded that, even if Kerr had lost his status as a citizen informant, his account of the shooting was still sufficiently corroborated to establish probable cause to issue the warrant. Moreover, the prosecutor argued that exigent circumstances—the fast-breaking nature of the investigation, and the imminent danger that Cheely would contact Gustafson and tell him about Kerr's decision to aid the police—had justified the authorities' decision to proceed with the first monitored conversation.

Judge Johnstone ruled that Kerr's admission of the burglary and theft did not invalidate the already-issued *Glass* warrant. He found that the officer who applied for the warrant had testified in good faith at the hearing. Judge Johnstone further ruled that, despite Kerr's later confession to the burglary/theft and the prosecutor's

grant of immunity for those two crimes, Kerr remained a citizen informant:

> Mr. Kerr had not asked for [any]thing before giving his statement. There is no reason to believe that Kerr was anything but a citizen informant when he made it. [Even if] he did [tell the police] that he was involved in a burglary and then asked if he could be prosecuted, [that] is not the same thing as holding out for something.

Judge Johnstone also ruled, alternatively, that exigent circumstances had justified the first monitored conversation even if the police had been obliged to return to the magistrate to inform him of Kerr's confession to the burglary/theft.

On appeal, Gustafson renews his claim that the prosecutor and the police violated a duty of candor to the magistrate who issued the *Glass* warrant. Gustafson does not claim that the police misrepresented their knowledge of Kerr's background when they applied for the warrant. Rather, Gustafson argues that the authorities, having prompted the magistrate to declare Kerr a "citizen informant" and then learning that Kerr had committed two felonies, were obligated to cease their efforts to execute the warrant and return to the magistrate to inform him of this new information.

■■■ Prosecutors and police officers applying for a warrant owe a duty of candor to the court; they may neither attempt to mislead the magistrate nor recklessly misrepresent facts material to the magistrate's decision to issue the warrant. *Malkin v. State*, 722 P.2d 943, 946 (Alaska 1986). Moreover, case law supports Gustafson's assertion that, even though the authorities have obtained a valid warrant in good faith, the government remains under a continuing duty to apprise the issuing magistrate of new information that destroys or substantially undermines the magistrates' prior finding of probable cause. *See United States v. Marin–Buitrago*, 734 F.2d 889, 893 (2nd Cir.1984).

However, even assuming that the authorities were under a duty to return to the magistrate if new information undermined the prior finding of probable cause, we conclude that the prosecutor and police did not violate this duty in Gustafson's case. Kerr's confession to the burglary/theft, and the prosecutor's decision to grant him immunity for these crimes, did not alter Kerr's status as a citizen informant at the crucial time when the police applied for the warrant and the magistrate made his finding of probable cause.

■■■ The distinction between a citizen informant and a criminal informant does not turn on the bare facts of the informant's past. Rather, as our supreme court indicated in *Erickson v. State*, 507 P.2d 508 (Alaska 1973), the informant's status turns on the nature of the informant's involvement with the incident being investigated and his or her motivation for coming to the authorities:

> A different rationale exists for establishing the reliability of named "citizen-informers" as opposed to the traditional idea of unnamed police contacts or informers who usually themselves are criminals. Information supplied to officers by the traditional police informer is not given in the spirit of a concerned citizen, but often is given in exchange for some concession, payment, or simply out of revenge against the subject. The nature of these persons and the information which they supply convey a certain impression of unreliability, and it is proper to demand that some evidence of their credibility and reliability be shown.

*Erickson*, 507 P.2d at 517, quoting *State v. Paszek*, 50 Wis.2d 619, 184 N.W.2d 836, 842 (1971). The *Paszek* opinion continues:

> However, an ordinary citizen who reports a crime which has been committed in his presence ... stands on much different ground than a police informer. He is a witness to criminal activity who acts with an intent to aid the police in law enforcement because of his concern for society or for his own safety. He does not expect any gain or concession in exchange for his information.

*Paszek*, 184 N.W.2d at 843. Thus, the law examines the person's connection to the event and his or her probable motive for

bringing the information to the police. When a person's primary motive is to obtain an official concession or reap some other personal benefit, the law requires greater corroboration of the person's information. If, however, the individual comes forward without concern for personal benefit, the law requires less corroboration.

■ Under this analysis, an individual's criminal background or lack of criminal background does not automatically determine his or her status for *Aguilar/Spinelli* purposes. Similarly, the fact that a person has previously been viewed as a criminal informant does not mean that his or her status cannot change in future cases:

> The fact that one has once been a police informant does not for all time so categorize the person or relegate the person to that status if in a particular case he is more than a mere "tipster," but rather is one who is known to be so situated as to acquire and relay reliable information.

Wayne R. LaFave, *Search and Seizure* (2nd ed. 1987), § 3.4(a), 1993 pocket part to Vol. 1, p. 120 (supplementing the text on p. 728 of the main volume), quoting *State v. Friday*, 147 Wis.2d 359, 434 N.W.2d 85 (1989).

■ In Gustafson's case, Kerr gave the police a detailed account of the shooting. He admitted that he had been in Gustafson's car and had personally witnessed the shooting, but he denied being criminally involved in the assault. Moreover, Kerr volunteered to wear a monitoring device and engage Gustafson and Cheely in conversations about the shooting. Kerr's willingness to aid the investigation in this manner bolsters the conclusion that he was truthfully reporting Gustafson's and Cheely's involvement in the shooting, since Kerr knew that the authorities would record everything he, Gustafson, and Cheely said. Compare *State v. Bianchi*, 761 P.2d 127, 131 (Alaska App.1988), where this court noted that a magistrate can reasonably conclude that a suspect would be hesitant to give the police false information when the police are in a position to verify the information.

We also note that, before Kerr went to the police, he voluntarily told another person—his employer—about having witnessed the shooting, thus potentially incriminating himself if he indeed had participated in the crime. Finally, Kerr provided his information and volunteered to aid the investigation without seeking any concession from the government, either with regard to the highway shooting or with regard to the burglary/theft.

These facts support the conclusion that Kerr was a citizen informant who went to the police, not to seek personal advantage, but because he thought it was the right thing to do. Rather than seeking lenient treatment for the burglary/theft, Kerr apparently thought that he could help the police in their murder investigation without revealing his participation in these two crimes. Kerr revealed the crimes to the police only when he belatedly realized that Gustafson might mention the burglary and theft during their taped conversation.

■ It could be argued that Kerr purposefully waited to confess to the burglary and theft until the authorities would feel compelled to bargain. However, when Kerr confessed to the burglary and theft, he had already surrendered his strongest bargaining chip—his detailed information concerning the murder. This information, combined with the other facts known to the police at the time, was enough to secure an indictment against Gustafson and Cheely. Kerr could no longer be assured of lenient treatment. Further, the police investigator who drove Kerr to the airport testified that Kerr simply asked whether he would be prosecuted for the burglary/theft; he did not demand that the prosecutor give him immunity in exchange for his continued cooperation.

We therefore conclude that, despite Kerr's confession to a burglary/theft and the prosecutor's grant of immunity for these two crimes, Kerr remained a citizen informant for purposes of evaluating his credibility and the existence of probable cause under *Aguilar/Spinelli*.

■ We additionally conclude that, even if Kerr were to be viewed as a criminal

informant, the *Glass* warrant would still be supported by probable cause. Police investigation corroborated Kerr's account of the shooting—both the location of the assault and the fact that the assailant had fired a single shot from a .308 caliber rifle. The victims' car was hit by one bullet, and the police discovered an expended .308 caliber cartridge near the Muldoon Avenue exit. This corroboration was sufficient to sustain the magistrate's finding of probable cause even if Kerr's later revelation of the burglary and theft made him a criminal informant. Even assuming that Kerr may have been motivated to provide information about the shooting in the hope that his assistance would lead the authorities to treat him leniently with regard to his yet-undisclosed participation in the burglary and theft, we conclude that the magistrate's awareness of this potential motivation would not have caused him to deny the warrant. *See Doisher v. State*, 632 P.2d 242, 247–48 & n. 5 (Alaska App.1981).

Thus, regardless of whether Kerr is viewed as a citizen informant or a criminal informant, the *Glass* warrant remained supported by probable cause. For this reason, the prosecutor and the police did not violate their duty of candor to the court when they failed to interrupt their execution of the *Glass* warrant and return to the magistrate to apprise him of Kerr's confession and the prosecutor's grant of immunity.[2]

### Validity of the Indictment

An Anchorage grand jury indicted Gustafson for first-degree murder. (At Gustafson's trial, the jury acquitted him of this crime but convicted him of the lesser included offense of second-degree murder.) On appeal, Gustafson challenges his indictment on several grounds.

### a. Sufficiency of the Evidence

■ Gustafson first asserts that the first-degree murder charge was not supported by sufficient evidence of an intent to kill.[3] We conclude that the evidence

---

**2.** Judge Johnstone also found that exigent circumstances justified the authorities' decision to execute the warrant and obtain the first conversation with Gustafson before returning to the magistrate with the information about Kerr's crimes and the prosecutor's promise of immunity. This finding requires some comment.

The "exigent circumstances" exception to the warrant requirement normally covers instances in which the police have probable cause to conduct a search but have insufficient time to obtain judicial authorization for the search. This court has also applied the exigent circumstances doctrine to uphold police decisions to execute a *Glass* warrant even though the person they are recording is not the person named in the warrant. *Pruitt v. State*, 829 P.2d 1197, 1198–99 (Alaska App.1992); *Fox v. State*, 825 P.2d 938, 939 (Alaska App.1992).

Gustafson asserts that, before the police executed the warrant, they received new information that destroyed the magistrate's basis for issuing the warrant. This distinguishes Gustafson's case from *Pruitt* and *Fox*. It is one thing to recognize that exigency may justify a search if the police have probable cause but no time to procure a warrant; it is another matter to declare that, because of the press of circumstances, the police may serve a warrant even when they realize they no longer have probable cause to conduct the search.

Because Judge Johnstone ruled that the warrant was still supported by probable cause, even after Kerr had admitted the burglary and theft and had been granted immunity for these crimes, we do not interpret the judge's "exigent circumstances" ruling as a declaration that the police could proceed to tape Gustafson's conversations with Kerr without probable cause. Rather, we interpret Judge Johnstone's ruling as a finding that the police and prosecutor acted in good faith when they executed the *Glass* warrant and taped Kerr's first conversation with Gustafson instead of immediately returning to the magistrate.

Judge Johnstone found that Cheely had been alerted to Kerr's role in the investigation and that there was a significant danger that Cheely would soon communicate his knowledge to Gustafson. Additionally, Kerr had already spoken to Gustafson over the telephone and had told him that he would arrive at the airport within the hour. Under these circumstances, Judge Johnstone could reasonably conclude that the authorities acted in the good faith belief that interruption of the investigation would have jeopardized its success. This is tantamount to a finding that the authorities' failure to return immediately to the magistrate was not "intentional" for purposes of *Malkin*, 722 P.2d at 946 n. 6—that is, the authorities did not engage in a "deliberate attempt to mislead a judicial officer".

**3.** We note that, because Gustafson was convicted of second-degree murder at his trial and because Gustafson concedes that the grand jury heard sufficient evidence to justify indicting

presented to the grand jury supports Gustafson's indictment for first-degree murder. As Judge Johnstone noted when he denied Gustafson's motion to dismiss the indictment, Cheely and Gustafson were incensed by the fact that the Toyota had come so close to their car; their anger provided a motive for shooting at the driver. Cheely (who was driving Gustafson's car) maneuvered the car so as to afford Gustafson a clear shot at the Toyota. Gustafson's shot entered the rear window of the car and struck Cain in the head; from this, the grand jury could reasonably infer that Gustafson had taken aim at the people in the Toyota rather than merely aiming at the Toyota's wheels or some other part of the vehicle. Moreover, the grand jury heard testimony that, when the Toyota failed to stop or veer off following Gustafson's rifle shot, Gustafson declared, "I missed." Viewed in the light most favorable to upholding the indictment, Gustafson's statement indicated that he had failed to accomplish his purpose of shooting the driver of the car.

Gustafson points to various aspects of the grand jury evidence tending to prove that Gustafson lacked an intent to kill. However, this court must construe the evidence in the light most favorable to upholding the indictment. *Panther v. State,* 780 P.2d 386, 389 (Alaska App.1989); *York v. State,* 757 P.2d 68, 72 (Alaska App.1988). We affirm Judge Johnstone's ruling that Gustafson's first-degree murder indictment was supported by sufficient evidence of intent to kill.

### b. Highlighted Transcripts of the Monitored Kerr–Gustafson Conversations

The prosecutor who presented Gustafson's case to the grand jury provided the grand jurors with transcripts of the monitored conversations between Kerr and Gustafson (the initial telephone call to set up the meeting at the airport, and the two ensuing face-to-face conversations at the airport). The prosecutor had highlighted

certain portions of these transcripts to call the jurors' attention to the portions of the conversations that the prosecutor believed were most relevant to proving the elements of first-degree murder. Gustafson argues that the prosecutor's action constituted an improper attempt to influence the grand jury's consideration of the monitored conversations and, ultimately, their decision whether to indict Gustafson for first-degree murder.

 However, a prosecutor presenting a case to a grand jury may comment on the evidence—may characterize the evidence and argue his or her view of how the law should apply to it—so long as the prosecutor's comments do not exceed the type of comment or summation allowed at trial to a petit jury. *Castillo v. State,* 614 P.2d 756, 761–63 (Alaska 1980); *Coleman v. State,* 553 P.2d 40, 47–52 (Alaska 1976); *Anthony v. State,* 521 P.2d 486, 496–97 n. 37 (Alaska 1974).

In *Castillo, Coleman,* and *Anthony,* the supreme court cited ABA Prosecution Function Standard § 3.5:

3.5 *Relations with Grand Jury*

(a) Where the prosecutor is authorized to act as legal advisor to the grand jury he may appropriately explain the law and express his opinion on the legal significance of the evidence but he should give due deference to its status as an independent legal body.

(b) The prosecutor should not make statements or arguments in an effort to influence grand jury action in a manner which would be impermissible at trial before a petit jury.

(c) The prosecutor's communications and presentations to the grand jury should be on the record.

In *Coleman,* the supreme court noted that the commentary to ABA Standard § 3.5 explained why a prosecutor should be able to argue a case to the grand jury:

[W]here the prosecutor must prosecute an indictment returned by the grand

him for second-degree murder, Gustafson's insufficiency of the evidence claim might be moot. Given our finding that the grand jury

evidence supported the indictment for first-degree murder, we do not reach the mootness issue.

jury, it is especially important that he be free to express his opinion. A prosecutor who has conducted an adequate investigation and analyzed the evidence is in a position to furnish guidance to the grand jury on the law and the weight of the evidence and should be free to do so whether this leads to a determination to indict or not to indict.

*Coleman*, 553 P.2d at 48, n. 29.

The ABA commentary continues:

A prosecutor should not, however, take advantage of his role as the ex parte representative of the state before the grand jury to unduly or unfairly influence it in voting upon charges brought before it. In general, he should be guided by the standards governing and defining the proper presentation of the state's case in an adversary trial before a petit jury.

Commentary to ABA Prosecution Function Standard § 3.5 (p. 88).

The prosecutor who presented Gustafson's case did not violate these standards. On the first day of the grand jury proceedings, the prosecutor spoke to the grand jurors about the highlighted transcripts:

Certain portions of those transcripts have been highlighted by me with a yellow felt pencil to call to your attention certain parts of the transcript that deal with the elements of this particular offense. And, in viewing those transcripts, you need to understand that you are to view the entire transcript, not necessarily giving any undue weight to the portions which I have selected as being particularly relevant to your deliberations. All I'm saying is: look at my underlining, but view the document in its entirety.... They're multi-page documents, and I've gone through them and selected portions which I feel are important. [But] you may disagree, so look at the entire document.

Given this explanation and caution to the grand jury, the prosecutor did not exceed the scope of his authority by highlighting portions of the transcripts. Moreover, later in the proceedings, when one of the grand jurors asked whether they could listen to the tape recordings themselves, the prosecutor told the grand jury that the tapes were available to them if they wished.[4]

■■■ Gustafson asserts that the prosecutor failed to highlight portions of the transcripts that tended to show Gustafson's lack of intent to kill. However, the prosecutor need not argue the defense case at grand jury. Further, as the above-quoted remarks demonstrate, the prosecutor clearly informed the grand jurors that they would be well-advised to read the tran-

---

4. Gustafson makes two additional arguments concerning the tapes:

Gustafson first claims that Evidence Rule 1002 required the prosecutor to introduce the tapes themselves, not transcripts. This claim was not raised in the trial court, so it is therefore not preserved for appeal. *Gaona v. State*, 630 P.2d 534, 537 (Alaska App.1981). Moreover, Gustafson does not assert that the transcripts were inaccurate.

Gustafson next claims that the prosecutor improperly discouraged the grand jurors from listening to the tapes. He points out that the prosecutor told the grand jurors that the tapes were "fairly long". The prosecutor also made remarks that could be construed as representations that he believed the grand jury would have sufficient evidence without listening to the tapes themselves, and that they should not delay the proceedings without good reason, since the ten days for holding Gustafson without either a preliminary hearing or an indictment expired that same day.

However, the supreme court rejected a similar challenge to the indictment in *Coleman*. In *Coleman*, the grand jury asked to have a physician called to explain the results of a physical examination of the victim. The prosecutor discouraged the grand jury, telling them, "I don't think calling a doctor is needed. I think you've heard enough to have this person tried, ... [a]nd we can't go calling in experts on every case." 553 P.2d at 49. The supreme court held that the prosecutor's comments did not invalidate the ensuing indictment because, despite the prosecutor's attempt to dissuade the grand jurors from calling the expert witness, the prosecutor had also clearly informed the grand jury of their right to hear any witness they wished and of the correct standard to apply in deciding whether the evidence they had heard justified indictment. *Id.* at 50.

Using similar reasoning, we conclude that the prosecutor's comments to Gustafson's grand jury about the advisability of listening to the tapes themselves did not invalidate the ensuing indictment.

scripts in their entirety, since the grand jurors might disagree with the prosecutor about which portions were important. We find no error.

### c. Sufficiency of the Manslaughter Instruction

■ When the prosecutor asked the grand jury to begin deliberations on first-degree murder, one of the grand jurors expressed a desire to know about the other degrees of criminal homicide. In response, the prosecutor gave the grand jury instructions on first-degree murder, second-degree murder, manslaughter, and criminally negligent homicide.[5]

■ On appeal, Gustafson concedes that the prosecutor's instructions on first- and second-degree murder were "thorough", but he challenges the manslaughter instruction as cursory and incomplete. In particular, Gustafson claims that the prosecutor should have given the grand jury a fuller explanation of how the recklessness required to make a homicide manslaughter under AS 11.41.120(a)(1) differs from the "extreme indifference to the value of human life" required to make a homicide second-degree murder under AS 11.41.-110(a)(2). *See Neitzel v. State*, 655 P.2d 325 (Alaska App.1982). We reject Gustafson's claim for two reasons.

First, this court has already held that "[t]he meaning of 'recklessly' is well within the comprehension of the average juror and the [criminal] code definition appears to be a common-sense definition of the term." *Walker v. State*, 674 P.2d 825, 829–830 (Alaska App.1983), quoting *Williams v. State*, 648 P.2d 603, 608 (Alaska App.1982). Thus, in the absence of a suggestion that the facts of Gustafson's case raised a subtle question concerning the scope of "recklessness" under the criminal code, we assume that the grand jury had a basic but adequate understanding of what a reckless killing was. Gustafson

concedes that the instructions concerning second-degree ("extreme indifference") murder were thorough. We therefore conclude that the grand jurors, hearing that a killing done with "extreme indifference to the value of human life" constituted a more serious crime than a "reckless" killing, grasped that there was a significant difference between the two culpable mental states and understood the basic distinction.

■ Moreover, Gustafson has failed to show that he was prejudiced by the alleged inadequacy of the manslaughter instruction. The grand jury indicted Gustafson for first-degree murder, finding that he had acted with intent to kill. The grand jury therefore did not need to reach the question of unintended killings—in particular, how extreme indifference to the value of human life differs from normal recklessness. Any inadequacy in the manslaughter instruction was harmless.

### d. Failure to Present Exculpatory Evidence

Gustafson asserts that the prosecutor improperly failed to apprise the grand jury of certain portions of Kerr's initial statement to the police that tended to show that Gustafson had not intended to kill anyone when he fired his rifle. Gustafson points to three portions of Kerr's initial statement which, he claims, either are inconsistent with Kerr's grand jury testimony or substantially strengthen the portions of Kerr's grand jury testimony that tend to show that Gustafson did not shoot with intent to kill.

■ Because the State presents cases to grand juries *ex parte*, prosecutors are under a duty to apprise grand juries of exculpatory evidence. *Frink v. State*, 597 P.2d 154, 164–66 (Alaska 1979). However, this duty extends only to evidence that "in and of itself tends to negate guilt." *York v. State*, 757 P.2d 68, 73 (Alaska App.1988).

---

**5.** In general, a prosecutor has no duty to instruct a grand jury on potential lesser offenses. *Castillo*, 614 P.2d at 763; *Konrad v. State*, 763 P.2d 1369, 1378 (Alaska App.1988). Here, however, the prosecutor responded to the grand jury inquiry by providing instruction on the various

degrees of homicide. Having voluntarily undertaken this duty, the prosecutor was obliged to instruct the grand jury correctly. For purposes of the present case, we assume that the prosecutor's decision likewise obliged him to instruct the jury adequately.

A prosecutor need not present evidence that reveals only inconsistencies or potential avenues of defense. *See Konrad v. State,* 763 P.2d 1369, 1377 (Alaska App. 1988); *Tookak v. State,* 648 P.2d 1018, 1021 (Alaska App.1982).

■ The fact that a witness's prior statements may be arguably inconsistent with, may qualify, or may elaborate on the witness's grand jury testimony does not convert these prior statements into "exculpatory evidence" for purposes of the *Frink* rule. *See Frink,* 597 P.2d at 166; *Wilkie v. State,* 715 P.2d 1199, 1201–02 (Alaska App.1986); *Abruska v. State,* 705 P.2d 1261, 1273 (Alaska App.1985). Gustafson has shown no more than this. The prosecutor did not breach his duty to present exculpatory evidence.

### e. Evidence that Gustafson was Entertained by Prostitutes

■ The prosecutor presented evidence to the grand jury that, following the highway shooting, Gustafson, Cheely, and Kerr had rented a motel room and were visited there by two prostitutes. This incident had essentially no relevance to the charge against Gustafson, and the superior court, pursuant to Evidence Rule 404(b), excluded this evidence from Gustafson's trial. Gustafson argues that this evidence should have been excluded from the grand jury proceedings as well, and the State's appellate brief implicitly concedes that Gustafson is right. See *Frink,* 597 P.2d at 171, holding that the superior court abused its discretion when it admitted similar testimony at a murder trial.

However, even though it was error to present this evidence to the grand jury, Gustafson's indictment is to be overturned only if this evidence appreciably affected the grand jury's decision. *Oxereok v. State,* 611 P.2d 913, 916 (Alaska 1980); *Stern v. State,* 827 P.2d 442, 445–46 (Alaska App.1992). Given the seriousness of the charge against Gustafson, the considerable evidence tending to show his guilt of a criminal homicide, and the scant attention given to the incident with the prostitutes, we conclude that this improper evidence did not appreciably affect the grand jury's decision to indict Gustafson for murder.

### f. Dismissal of a Grand Juror Before Deliberations

■ As the prosecutor reached the close of the State's evidence, one of the grand jurors indicated that she had a child-care problem because the session had run so late in the afternoon. Recognizing that he did not have the authority to excuse the grand juror, the prosecutor attempted to reach the clerk of court and the presiding judge. When these efforts were unsuccessful, the prosecutor tried to contact two other superior court judges, again without success.

Finally, the prosecutor reached Superior Court Judge John Reese. After the prosecutor explained the problem, Judge Reese asked how many grand jurors would remain if the one juror were excused. The prosecutor reported that 17 jurors would be left, a sufficient number under Criminal Rule 6(d). Judge Reese then excused the juror with child-care problems.

Gustafson challenges Judge Reese's action, asserting that it violated Criminal Rule 6(s). Under Rule 6(s), the presiding judge of the superior court has the power to excuse a grand juror:

> **Discharge and Excuse.** ... At any time for cause shown the presiding judge may excuse a juror either temporarily or permanently....

Criminal Rule 6(t) allows the presiding judge to delegate this power to another superior court judge when the grand jury is sitting in a location different from the presiding judge's, or when the presiding judge is otherwise unavailable. However, Rule 6(t) appears to contemplate an affirmative act of delegation.

Gustafson argues that his indictment must be dismissed because a judge other than the presiding judge excused the grand juror. We do not agree. First, we do not accept Gustafson's underlying claim that, if the presiding judge could not be reached, all other superior court judges were powerless to deal with the situation. When grand jury proceedings extend past the

close of business, so that the presiding judge is unavailable to hear and determine a grand juror's request to be excused, we believe that another superior court judge would be justified in invoking Criminal Rule 53 to deal with the situation:

> **Relaxation of Rules.** These rules are designed to facilitate business and advance justice. They may be relaxed or dispensed with by the court in any case where it shall be manifest to the court that a strict adherence to them will work injustice.

While we recognize the value of having one judicial officer hear and decide all grand juror requests, it seems manifestly unjust (both to the affected grand juror and to any potential defendant facing indictment) to force a grand juror to continue deliberating until the presiding judge can be found. Such a construction of the criminal rules both senselessly inconveniences the grand juror and poses a significant danger that the grand jury will rush its decision in order to alleviate the affected juror's distress.

▆▆▆ Additionally, even if we assume that Judge Reese had no power to excuse the grand juror, Gustafson has not shown that Judge Reese's action prejudiced him. Under Criminal Rule 6(n)(1), an indictment requires a majority vote of the total number of people "comprising the grand jury when the grand jury [was] sworn and charged with instructions". Under this rule, the departure of one or more grand jurors does not reduce the majority needed for indictment. The record discloses that there were 18 grand jurors before the challenged departure; 10 votes were needed to return an indictment. The grand juror's departure did not alter the required majority but simply made it harder to obtain.[6]

For all these reasons, the superior court properly rejected Gustafson's attacks on his indictment.

*Sentencing Issues*

As noted above, Gustafson was sentenced to 65 years' imprisonment for second-degree murder. On appeal, Gustafson makes two sentencing arguments: first, that the written judgement Judge Johnstone signed misstates the sentence Gustafson received; and second, that the 65-year sentence is excessive.

At sentencing, the State asked Judge Johnstone to restrict Gustafson's eligibility for parole during the 65-year term of imprisonment. *See* AS 12.55.115. Judge Johnstone declined. Nevertheless, the superior court's written judgement states that Gustafson's term of imprisonment "is all or partially presumptive", and that Gustafson "is ineligible for parole, except as provided in AS 33.16.090(b) and (c)."

▆▆▆ Gustafson points out, correctly, that he did not and could not receive a presumptive sentence. Although second-degree murder carries a mandatory 5-year minimum term, sentences for second-degree murder are not presumptive terms. AS 12.55.125(b); *Weitz v. State*, 794 P.2d 952, 957 n. 3 (Alaska App.1990). Thus, Gustafson's eligibility for parole is governed by AS 33.16.100(d), not AS 33.16.-090(b)-(c). The superior court should amend the written judgement to reflect Gustafson's true sentencing and parole status.

▆▆▆ We turn now to Gustafson's main sentencing argument: that his 65-year term of imprisonment is excessive. This court has established a benchmark sentencing range of 20 to 30 years' imprisonment for second-degree murder. *Page v. State*, 657 P.2d 850, 855 (Alaska App.1983). Gustafson's 65-year sentence is considerably more severe than this benchmark range. The court could impose such a sentence only if there are articulable reasons either to view Gustafson as an atypically dangerous offender or to view his offense as atypically serious. *Williams v. State*, 809

---

**6.** Compare Criminal Rule 6(g), which governs situations in which one or more members of the grand jury panel lacked the legal qualifications to sit as grand jurors. Rule 6(g) provides that indictments returned by that panel are nevertheless valid if a majority of the qualified grand jurors concurred in the indictment.

P.2d 931, 933–35 (Alaska App.1991) (on re-hearing).

■■■ Gustafson was 19 years old at the time of sentencing. The facts of the murder have been described above. In addition, the presentence report contained information that, the week before the shooting, Gustafson (along with Cheely and Kerr) had burglarized a store in Eagle River and had stolen about $19,000. (Gustafson was indicted for this burglary and theft, but after he was convicted of murder the State chose not to pursue these additional charges.) When Gustafson discovered that two of Cheely's friends knew that they had committed the burglary and theft, Gustafson spoke of "blowing [them] away", commenting that he and Cheely "did not need any more witnesses".

The sentencing record contains other instances of Gustafson's violent tendencies. Two months before the shooting, Gustafson had gotten drunk at a party and, for no apparent reason, had threatened several people with a kitchen knife; he slashed one woman in the stomach before he was wrestled to the ground, disarmed, and subdued.

At the sentencing hearing the State supplemented the pre-sentence report with testimony from several witnesses. Two of these witnesses saw Gustafson assault a schoolmate with a switchblade knife when he was in eighth grade. One of the witnesses also testified that Gustafson was fond of throwing rocks and shooting arrows at neighborhood pets; the witness said that Gustafson had once killed a dog with an arrow. Another witness testified that Gustafson had admitted stealing dynamite from the Alaska Railroad, and that Gustafson had assembled a pipe bomb which he brought to high school to display to his friends.

On his own behalf, Gustafson submitted an evaluation performed by Dr. Ronald Ohlson, a clinical psychologist who interviewed Gustafson just before sentencing and who administered two personality assessments to him—the Minnesota Multiphasic Personality Inventory II (MMPI) and the Millon Clinical Multiaxial Inventory (MCMI). Apparently at the instruction of Gustafson's attorney, Dr. Ohlson agreed to interview and evaluate Gustafson without asking Gustafson about his offense. At the sentencing hearing, Dr. Ohlson conceded that he had not reviewed the police reports, grand jury evidence, or trial evidence. Dr. Ohlson also apparently was unaware of the contents of the pre-sentence report, since his evaluation states that he had "no data which indicates that [Gustafson] has engaged in violent behavior in the past."

Gustafson told Ohlson that he was not a violent person, that "he had always been a good kid", and that he had been in only two minor difficulties with the law, both when he was a young teenager. Gustafson's MMPI results were within normal ranges, although the test did indicate that Gustafson was prone to "pleasure-seeking, impulsivity, ... rule infractions, and high-risk behavior". According to Dr. Ohlson, Gustafson's MCMI results suggested a "deeply ingrained and pervasive pattern of maladaptive functioning", as well as "prominent narcissistic features" and "obsessive compulsiveness". However, Dr. Ohlson discounted these results because he was unaware of any evidence that these traits had interfered with Gustafson's "vocational or social functioning".

Dr. Ohlson concluded that Gustafson's psychological profile was not characteristic of criminals but rather was "a normal profile with some acting-out and rule-breaking tendencies, as well as a basic narcissistic and rebellious posturing." [7] In reaching his conclusion, Dr. Ohlson relied on the purported fact that Gustafson's past was "free of criminal behavior": "[Gustafson's] major strengths ... appear to be his lack of criminal record and what appears to be a preference for endurance and hard work in socially acceptable vocational endeavors." Dr. Ohlson concluded that Gustafson was "not likely to ... act out anger and aggression in [an] antisocial [manner]".

---

7. At the sentencing hearing, Dr. Ohlson modified this conclusion somewhat, asserting that he now believed Gustafson suffered from a "narcissistic personality disorder".

Judge Johnstone found that Gustafson's offense was among the most serious within the definition of second-degree murder because Gustafson, incensed over a perceived minor slight, deliberately aimed at a small car and, from short range, fired a shot from a high caliber rifle toward its occupants. The judge found that Gustafson demonstrated no remorse.

Judge Johnstone rejected Dr. Ohlson's sanguine view of Gustafson's rehabilitative potential because he found that Ohlson had been given little accurate information about Gustafson's background and offense. Instead, Judge Johnstone found that Gustafson's prospects for rehabilitation were "guarded to poor". Judge Johnstone noted that Gustafson had repeatedly demonstrated inexplicably violent behavior, that he had developed into a dangerous person, and that nothing in his background provided insight into his tendency toward violence. Based on these factors, Judge Johnstone concluded that Gustafson presented "a continuing threat of violence to the public" and that Gustafson currently was probably not amenable to treatment. Moreover, Judge Johnstone concluded that a lengthy prison term was required to deter other people from similar acts of violence.

Judge Johnstone also believed that Gustafson should receive a severe sentence to express the community condemnation of his conduct. The judge pointed out that Gustafson's crime had engendered widespread community condemnation because the crime threatened the entire community's sense of safety; Gustafson's senseless and unpredictable act of violence had forced all citizens to grapple with "the thought that it could have been anyone".

For these reasons, Judge Johnstone found that a sentence within *Page*'s 20– to 30–year benchmark range would not adequately address the sentencing goals enunciated in *State v. Chaney*, 477 P.2d 441, 443–44 (Alaska 1970), and now codified in AS 12.55.005. At the same time, Judge Johnstone concluded that Gustafson's conduct and background did not make him a worst offender, so he rejected both the maximum sentence (99 years) and the State's suggestion that he restrict Gustafson's eligibility for parole. Instead, Judge Johnstone sentenced Gustafson to 65 years' imprisonment, a term midway between the benchmark range and the maximum sentence.

In challenging this sentence, Gustafson cites *State v. Krieger*, 731 P.2d 592 (Alaska App.1987), in which this court discussed sentencing guidelines for second-degree murder:

> [W]here a homicide is unintentional, Alaska's appellate courts indicate that the defendant's potential for rehabilitation is of significance and a sentence of ten years or less is sufficient to satisfy the *Chaney* criteria.

*Id.* at 595, citing *Pears v. State*, 698 P.2d 1198, 1205 n. 15 (Alaska 1985); *Sumabat v. State*, 580 P.2d 323, 325 (Alaska 1978); *Husted v. State*, 629 P.2d 985, 987 n. 7 (Alaska App.1981). Gustafson asserts that, because he had no intent to kill his victim, under *Krieger* he should have received a sentence lower than the 20– to 30–year *Page* benchmark. However, *Krieger* cannot be read in the manner Gustafson suggests.

*Krieger* was an appeal brought by the State of Alaska, challenging a sentence as too lenient. The passage quoted above speaks of a range of sentences "sufficient to satisfy the *Chaney* criteria" for a particular type of homicide. In context, this language means only that such sentences generally are not clearly too lenient. This court did not purport to set an upper sentencing limit. See *Odom v. State*, 798 P.2d 353, 356 (Alaska App.1990), in which this court upheld a second-degree murder sentence of 12 years to serve against the argument that *Pears* and *Krieger* established a 10–year ceiling.

Moreover, under Alaska's current criminal code, *all* second-degree murders are "unintentional". By definition, a second-degree murder is a homicide committed by a defendant who did not intend to kill.[8] If

---

**8.** Any criminal homicide committed with intent

to kill is first-degree murder under AS 11.41.-

we interpreted the passage in *Krieger* as setting or advocating an upper boundary of 10 years' imprisonment for all unintentional homicides, *Krieger* would be at odds with the *Page* benchmark.

Examination of the three sentencing decisions cited in the passage from *Krieger* shows that the term "unintentional homicides" was meant to refer to criminal homicides that do not result from intentional assaults. *Pears* involved a vehicular homicide prosecuted as second-degree murder under AS 11.41.110(a)(2); the defendant in *Pears* did not intentionally assault his victims. *Pears*, 698 P.2d at 1199–1200. *Sumabat* and *Husted* involved manslaughter convictions under Alaska's prior criminal code, and both defendants committed involuntary manslaughters; that is, neither defendant acted with intent to kill. *Sumabat*, 580 P.2d at 324–25; *Husted*, 629 P.2d at 985–86 & n. 2. Indeed, the facts recited in *Sumabat* and *Husted* indicate that, as in *Pears*, neither defendant intentionally assaulted his victim; both victims died when firearms accidentally discharged during struggles.

Thus, even if we interpreted *Krieger* to require lenient treatment of some second-degree murders, this rule of leniency would apply only to second-degree murders that are not the result of intentional assaults. Gustafson intentionally fired his rifle at the car containing Chamberlain and Cain. Thus, he cannot claim the benefit of a sentencing guideline that applies to murders resulting from non-assaultive conduct.

Gustafson also argues that the legislative commentary to AS 11.41.110(a)(2) indicates that his conduct is typical of the kind of conduct the legislature thought would be encompassed by this section of the second-degree murder statute. However, the example of "extreme indifference" murder cited in the commentary is less culpable than Gustafson's conduct:

> Subsection (a)(2) describes conduct that is very similar to the "substantially certain" clause in subsection (a)(1). Under this provision, however, the defendant need not necessarily know that his conduct is substantially certain to cause death or serious physical injury. An example of conduct covered by this provision would be shooting through a tent under circumstances where the defendant did not know a person was inside or persuading a person to play "russian roulette". The defendant is only required to intend to perform the act; there is no requirement that he intend to cause death or that he know that his conduct is substantially certain to cause death.

1978 Senate Journal, Supplement No. 47 (June 12), p. 10. In contrast to the commentary's examples, Gustafson did not fire his rifle in ignorance of whether the car was occupied or in ignorance of whether the weapon would fire a bullet at someone who knew the risk; Gustafson knew that he was firing toward unprotected and unsuspecting people.

Finally, Gustafson claims that the superior court based his sentence on unsupported "armchair psychological analysis". Gustafson challenges Judge Johnstone's sentencing remark that Gustafson "may have a significant personality disorder of some sort". Asserting that the evidence establishes no basis for this remark, Gustafson points to Dr. Ohlson's conclusion that Gustafson's psychological profile was within normal limits and did not reveal a criminal personality.

First, as mentioned in footnote 7 above, Dr. Ohlson conceded at sentencing that Gustafson suffered from a narcissistic personality disorder. Second, even without Dr. Ohlson's testimony, the sentencing record as a whole supports Judge Johnstone's conclusion that Gustafson poses a significant danger to others, even though the origin of his dangerous propensities might not be clearly identifiable, and also supports Judge Johnstone's conclusion that Gustafson's prospects for rehabilitation are guarded.

Our review of the record convinces us that Judge Johnstone's sentencing decision

---

100(a)(1) unless the killing is mitigated by heat of passion under AS 11.41.115(a); if so, the

crime is manslaughter. AS 11.41.120(a)(1) and AS 11.41.115(a), (e).

is not clearly mistaken. *McClain v. State,* 519 P.2d 811, 813–14 (Alaska 1974).

*Conclusion*

As discussed above, the superior court must alter its written judgement to reflect Gustafson's normal eligibility for parole. In all other respects, Gustafson's conviction and sentence for second-degree murder are AFFIRMED.