**John Kevin PHILLIPS, Appellant,**

v.

**STATE of Alaska, Appellee.**

**No. A–7428.**

Court of Appeals of Alaska.

May 30, 2003.

**20.** *Id.*

David D. Reineke, Assistant Public Defender, and Barbara K. Brink, Public Defender, Anchorage, for Appellant.

W.H. Hawley, Jr., and Kenneth J. Diemer, Assistant Attorneys General, Office of Special Prosecutions and Appeals, Anchorage, and Bruce M. Botelho, Attorney General, Juneau, for Appellee.

Before: COATS, Chief Judge, and MANNHEIMER and STEWART, Judges.

## OPINION

MANNHEIMER, Judge.

John Kevin Phillips was paroled from prison on January 9, 1997. On the afternoon of the next day, he committed armed robbery at a store in downtown Anchorage. During this robbery, Phillips wounded one of the victims with a knife. Phillips then hired a cab to drive him to Palmer.

When Phillips got to Palmer, he stole the cab and started driving east on the Glenn Highway. A state trooper, Bruce Heck, spotted the cab and turned on his overhead lights, attempting to initiate a traffic stop. Phillips would not stop, so Heck followed him down the highway. The road surface was quite slick and, while Phillips was fleeing from the trooper, he drove the cab off the highway and into a ditch. Phillips then ran into the woods.

Trooper Heck followed Phillips into the woods and eventually caught him—for when Phillips was finally arrested, he had handcuffs fastened to his left wrist. However, during or immediately after Heck's struggle with Phillips, Heck died—either from being smothered or after suffering a heart arrhythmia.

Based on this series of events, Phillips was convicted of first-degree robbery, second-degree assault, first-degree vehicle theft, second-degree escape, and second-degree murder. He now appeals these convictions.

Phillips argues that his trial was unfair because the robbery and assault charges (the charges arising from the events in Anchorage) were joined with the vehicle theft, escape, and murder charges (the charges arising from the events in Palmer and further east on the Glenn Highway, near Glennallen). Phillips also argues that the jury was misinstructed on the law of causation, so they could not properly decide whether Phillips was criminally responsible for Trooper Heck's death. In addition, Phillips asserts that his trial was unfair because a large number of uniformed troopers and police officers attended the trial—implicitly informing

the jury that the law enforcement community wanted to see the defendant convicted. Finally, Phillips argues that his sentence—142 years in prison—is excessive.

For the reasons explained here, we affirm Phillips's convictions but we vacate his sentence and direct the superior court to resentence Phillips.

*Underlying facts*

Phillips was released on parole from the Spring Creek Correctional Center on January 9, 1997. He got a ride to Anchorage; the driver dropped him off at the Fifth Avenue Mall so that he could buy some tennis shoes.

While he was buying the shoes, Phillips asked the store clerk where he could purchase a wig. The clerk was unable to help Phillips, so Phillips left the mall and went across the street to a restaurant, Club Paris, where he asked a waitress if she knew where he could purchase a wig. The waitress directed Phillips to "Fashion Wigs", a store in the Northway Mall. Later that afternoon, Phillips purchased a black long-haired unisex wig at Fashion Wigs. Around 4:00 p.m., Phillips checked into the Comfort Inn using the alias "Johnny Raven".

The next afternoon (January 10, 1997), a little after 4:00, Phillips donned the black wig and entered the Army–Navy Store on Fourth Avenue, where he purchased a 12-inch "K–Bar" knife (a combat-style knife).

Shortly thereafter, Phillips entered Fifth Avenue Furs. This fur shop was owned by Roberto Cuautle. Both Cuautle and his daughter, Liliana Hernández, were working in the store that afternoon. Hernández was seven-months pregnant, and her two young daughters (a three-year-old and a five-year-old) were also in the shop.

Phillips chose this store because he believed that Cuautle's son, Manuel, owed him money. Both Phillips and Manuel Cuautle had been imprisoned at Spring Creek. Manuel agreed to sell Phillips an ounce of marijuana for $700. Phillips sent a check for the purchase price to Manuel (in care of the fur shop). Phillips apparently received some of the marijuana, but before Manuel could de-

liver the rest of the ounce, Phillips was placed in segregation. By the time Phillips was returned to the general prison population, Manuel had been released—and, consequently, Phillips never received the remainder of the drug (or a refund of his money). Thus, Phillips was intent on obtaining restitution when he entered Fifth Avenue Furs on January 10th.

Posing as a customer, Phillips asked Liliana Hernández to show him some jackets. Without warning, Phillips pulled the K–Bar knife from under his jacket and held it to the middle of Hernández's abdomen. Phillips then told Roberto Cuautle not to move or he would kill Cuautle's daughter. Cuautle responded, "What do you want? We have no money." Cuautle opened the cash register, apparently to prove that there was no money in the store.

Phillips then forced Hernández and Cuautle to the back of the store, where he made them lie down on their stomachs. He placed a knee in each of their backs, and then he began bashing Roberto Cuautle's head into the ground, repeatedly asking, "Where is the money?" Neither Cuautle nor Hernández was aware of the prior drug transaction, so they did not understand what money Phillips was talking about.

When there was no money forthcoming, Phillips began to bash Cuautle's head into the ground with greater force. Hernández could see blood streaming down her father's face. Finally, Cuautle told Phillips that there was some money in his back pocket.

Phillips took $300 from Cuautle's wallet, but he told Cuautle that this was not enough. He then said to Cuautle, "Man, I can't believe you're going to let her [*i.e.*, Hernández] die for such a little amount; I can't believe you're going to let her die. You don't believe me, man? I'm going to slice her up like a fucking pig." Phillips then grabbed Hernández's hair and pulled her head back, exposing her neck. He told Cuautle, "Watch. You don't believe me? I'm going to kill her. Watch." Phillips then raised his knife to Hernández's throat. When Hernández saw what Phillips was doing, she instinctively put her left hand up to shield her throat. The

knife sliced through Hernández's palm, causing a deep gash that began to bleed profusely.

When Hernández realized that she was wounded, she yelled at Phillips to get her a towel, and Phillips complied. At about that time, there was a sound as if someone had entered the store. Phillips turned to look at the door, and then he decided to flee. In his rush to leave, Phillips abandoned the sheath for the K–Bar knife, as well as the blue plastic retail bag that the Army–Navy Store had given him when he purchased the knife. Phillips's fingerprints were later recovered from the plastic bag.

After Phillips ran from Fifth Avenue Furs, Hernández hit the silent alarm and called "911". The police responded to the robbery around 5:08 p.m.

After fleeing from Fifth Avenue Furs, Phillips went to Humpy's Great Alaska Alehouse, where he purchased a cup of soup and a shot of tequila. He then proceeded to the Hub Bar, where he was picked up by a cab around 6:00 p.m.

Initially, Phillips told the cab driver to take him to the Comfort Inn, so that he could recover his belongings. He then told the cab driver to take him to a fictitious address in Palmer. They arrived in Palmer around 7:00 p.m. When the cab driver got out of the cab to determine whether they had found the "right" address, Phillips stole the cab and headed east on the Glenn Highway. Around 8:30 p.m. he stopped at a lodge, where he purchased a cup of coffee. He also stopped at the scene of a single-vehicle accident to see if the stranded motorist needed help.

Around 9:30 p.m., Alaska State Trooper Bruce Heck spotted the stolen cab near Mile 156 of the Glenn Highway—that is, about thirty miles west of Glennallen. Trooper Heck informed his dispatcher (his wife, Laurie Heck) that he had spotted the cab and that he intended to follow it toward Glennallen. At 9:34 p.m. Trooper Heck notified his dispatcher that the cab was not yielding to his flashing lights. At 9:35 p.m., Trooper Heck informed his dispatcher that the cab had gone off of the highway and into the ditch.

Another motorist, Roy Yates, arrived at the scene shortly after the stolen cab went into the ditch. He saw the driver "moving swiftly" away from the overturned cab and into the woods. He then watched Trooper Heck head into the woods after the fleeing driver.

About fifteen minutes later, a second trooper, Don Pierce, arrived on the scene. Yates told Pierce that the first trooper (Heck) had pursued the cab driver into the woods and had disappeared from sight. Trooper Pierce immediately began to follow the footprints through the snow.

At the end of the freshly-made trail, Pierce discovered Heck lying on his back. Heck's face was covered with snow, and there was a great deal of blood in the immediate area. Heck had no pulse. The area around Heck's body was trampled down, as if there had been a struggle.

Trooper Pierce then spotted Phillips making his way back toward the Glenn Highway. Pierce raced back toward the highway, caught up with Phillips, and ordered him to stop and raise his hands. Phillips complied. When Phillips raised his hands into the air, Pierce could see that his left wrist was handcuffed. Phillips had blood on his face and hands.

*The joinder of the Anchorage and the Palmer/Glennallen charges*

Phillips was indicted by two different grand juries, one sitting in Palmer and the other sitting in Anchorage. On January 23, 1997, Phillips was indicted by a Palmer grand jury for murder, escape, and vehicle theft; all of these charges arose from Phillips's conduct in Palmer and on the Glenn Highway near Glennallen.

Three weeks later, Phillips was indicted by an Anchorage grand jury for robbery and assault stemming from his conduct at Fifth Avenue Furs. After the grand jury indicted Phillips on these charges, the prosecutor asked the jury foreperson to sign another, expanded indictment that added the Palmer and Glennallen counts (murder, escape, and vehicle theft). The prosecutor explained that he was asking the foreperson to do this "so

that we will have one trial". As requested, the foreperson signed the expanded indictment.

Before trial, Phillips asked the superior court to sever the Anchorage counts from the Palmer/Glennallen counts. He challenged the method by which these charges were joined, and he also argued that, in any case, joinder was not proper under Alaska Criminal Rule 8 or 13. Finally, Phillips argued that even if the charges were properly joined, they should be separated pursuant to Alaska Criminal Rule 14 because the joinder was unfairly prejudicial.

*(a) Could the Anchorage grand jury join these counts by simply adopting the charges contained in the Palmer indictment?*

■ Phillips contends that it was improper for the Anchorage grand jury to return an indictment listing both the Anchorage charges and the Palmer/Glennallen charges when the Anchorage grand jury did not hear any evidence concerning the Palmer/Glennallen charges. In other words, Phillips questions whether the Anchorage foreperson had the authority to simply sign an expanded indictment that included the Palmer/Glennallen charges based on the fact that Phillips had already been indicted on those charges by a separate grand jury.

We need not resolve this issue because Superior Court Judge Larry D. Card ultimately ruled that these two sets of charges should be joined under Alaska Criminal Rule 13. This rule declares that when a defendant faces trial on two or more indictments, the superior court may join all of the charges in a single trial "if the offenses ... could have been joined in a single indictment" under the rule set forth in Criminal Rule 8(a).

When Judge Card ruled that joinder of the charges was proper under Rule 13, he mooted the question of grand jury procedure. Instead, the question is now whether Judge Card abused his discretion when he ordered joinder under Rule 13. And since joinder is proper under Rule 13 only if the charges could have been joined in a single indictment under Rule 8(a), the resolution of this question really turns on whether all of the charges against Phillips are related to each

other in one or more of the ways listed in Rule 8(a).

*(b) Was joinder proper under Criminal Rule 8(a)?*

■ When Judge Card denied Phillips's motion for severance of the Anchorage charges from the Palmer/Glennallen charges, he stated that he felt that joinder was proper "because the sequence of events ... indicate[s] a relationship" between the offenses. But Phillips contends that joinder was improper because, even though some relationship may exist between the Anchorage charges and the Palmer/Glennallen charges, the charges are not related in any of the ways specified in Criminal Rule 8(a).

Criminal Rule 8(a) declares that different offenses can be joined in a single indictment if:

(1) [the offenses] are of the same or similar character and it can be determined before trial that it is likely that evidence of one charged offense would be admissible to prove another charged offense, [or]

(2) [the offenses] are based on the same act or transaction, or

(3) [the offenses] are based on two or more acts or transactions connected together or constituting parts of a common scheme or plan.

We conclude that Phillips's offenses were properly joined under subparagraph (3). The superior court could properly conclude that the Anchorage robbery and assault, the Palmer vehicle theft, and the Glennallen escape and murder constituted "acts or transactions [that were] connected together".

Viewing the evidence in the light most favorable to the superior court's ruling, Phillips committed armed robbery and assault shortly after being released from prison. He then enticed a cab driver to drive him from Anchorage to Palmer. Phillips apparently had no intention of paying for this transportation; he gave the driver a fictitious address and then he stole the cab. Phillips drove the stolen vehicle toward Glennallen, putting as much distance as possible between him and Anchorage. Just before Phillips reached Glennallen, he was apprehended by Trooper

Heck—leading to the further crimes of escape and murder.

Several Alaska cases have upheld joinder of charges when the defendant committed a crime and then assaulted the police officer(s) who attempted to confront or apprehend the defendant for this crime. For example, in *Newcomb v. State*, 800 P.2d 935 (Alaska App. 1990), the defendant escaped from prison and then violently assaulted the police officers who attempted to apprehend him. We concluded that there was an "obvious nexus" between Newcomb's escape and the efforts to apprehend him, and we therefore upheld the joinder of these charges under Criminal Rule 8(a)(3).[1]

Similarly, in *Maynard v. State*, 652 P.2d 489 (Alaska App.1982), the defendant assaulted a young girl in the evening, assaulted one of the police officers who came to arrest him the next morning, and then escaped. Again, this Court held that joinder of the three charges was proper because "the offenses [grew] out of a sequence of interrelated transactions", each one serving "to explain and render intelligible the others".[2] We noted that the defendant's assault on the girl "explain[ed] the police officers' presence on his porch" the next morning, and provided "some insight into [the defendant's] state of mind" when he swung a machete at one of the officers and then ran away.[3]

Phillips correctly notes that his case is arguably distinguishable from both *Newcomb* and *Maynard* because, in the present case, Trooper Heck was attempting to apprehend Phillips for vehicle theft, not for the Anchorage robbery and assault. But this distinction does not defeat joinder. Although Heck did not know that Phillips had committed robbery and assault in Anchorage, Phillips knew it. Phillips's commission of these Anchorage offenses was therefore relevant to help explain Phillips's decision to assault Heck and to escape from custody.

See also *Collins v. State*, 778 P.2d 1171 (Alaska App.1989), a case in which the defendant shot and killed a rival drug dealer at the request of some of his cohorts; then, the next day, he shot and killed four members of his own organization (and seriously wounded another) after he overheard conversations that led him to believe that he was to be the next victim.[4] This Court found that Collins's offenses were "clearly connected together" because

> [even though] the offenses arose out of two separate incidents, the incidents occurred only a day apart and were intimately related.... Under [the State's theory of the case], the August 6 shootings resulted from Collins' belief that he was going to be killed because of his role in the August 5 crime. Consequently, knowledge of the August 5 shooting was indispensable to an understanding of the events of August 6.

*Collins*, 778 P.2d at 1173.

For similar reasons, we conclude that the counts of the indictment charging Phillips with robbery and assault in Anchorage were properly joined under Criminal Rule 8(a)(3) with the counts of the indictment charging him with vehicle theft, escape, and murder.

*(c) Was Phillips unduly prejudiced by the joinder?*

■ Our conclusion that the charges against Phillips were properly joined does not end our inquiry, for Phillips also argues that even if joinder was proper, he was entitled to severance under Criminal Rule 14 because joinder of the charges unduly prejudiced the fairness of his trial.

In the present case, Phillips argues that joinder of the Anchorage charges unfairly prejudiced him with respect to the murder charge because the robbery and assault evidence was cumulative with respect to his motive, and because introduction of evidence concerning the robbery "undoubtably caused the jury to focus on [Phillips's] prior act[s], and convict him because of his character". These arguments are not persuasive.

Phillips's theft of the taxi cab was perhaps sufficient, in itself, to explain Phillips's deci-

---

**1.** *Newcomb*, 800 P.2d at 942–43.

**2.** *Maynard*, 652 P.2d at 491.

**3.** *Id.*

**4.** *Id.* at 1173.

sion not to pull over when Trooper Heck initiated the traffic stop. But what followed—Phillips's flight into the woods in sub-zero temperatures, and his assault on Trooper Heck to escape custody—are much better explained by the fact that Phillips had just committed armed robbery and assault. These are serious felonies, and Phillips could reasonably anticipate that he would receive lengthy terms of imprisonment for these offenses if he was captured. Because of this, it was not improper for the jury to "focus" on the Anchorage crimes to the extent that these crimes provided a potential motive for Phillips's conduct on the Glenn Highway.

For these reasons, we uphold the superior court's decision to allow Phillips to be jointly tried for the Anchorage offenses and the Palmer/Glennallen offenses.

*Potential prejudice arising from the presence of a large number of uniformed officers in the spectator section at the opening of the trial*

Because Phillips was charged with the murder of a state trooper, his case generated considerable interest within the law enforcement community. On appeal, Phillips claims that his right to a fair trial was prejudiced because a number of law enforcement officers attended the early stages of his trial, wearing their uniforms.

*(a) Underlying facts*

On the first day of Phillips's trial (Tuesday, January 20, 1998), just before the jury was brought into the courtroom to hear opening statements, Phillips's attorney voiced his concern over the "large contingent of uniformed officers" present in the spectator section of the courtroom. The defense attorney asserted that the presence of so many uniformed officers in an unofficial or personal capacity seemed "inappropriate", and he asked the trial judge to intervene because the presence of the officers was "psychologically prejudicial to [Phillips's] interests".

Initially, Judge Card minimized the defense attorney's concern. The judge declared that the court proceedings were open to everyone—and that law enforcement officers, like all other citizens, had a right to attend the trial. The judge further stated that he did not know whether he had the authority to bar the officers from wearing their uniforms while they attended court. Phillips's attorney responded that the court had a duty to make sure that the proceedings were conducted in a fair and impartial manner.

Judge Card asked the prosecutor if the officers had been ordered to attend the trial. The prosecutor answered that he thought that the officers were there voluntarily "to support Trooper Heck", and that they had not been ordered to attend. A subsequent inquiry of the six officers in attendance revealed that five of them were on duty, while the sixth officer was attending the trial on her day off. The prosecutor then explained that, even though the five officers were on duty, their reasons for attending the trial were personal:

> *Prosecutor:* They're here because they're interested in the outcome of the trial. They're interested in how the trial progresses. They're interested in supporting their fellow fallen officer. They're here because they're curious. They're here because they want to support the State. And I think those [are] all legitimate and constitutionally valid reasons.

During this discussion, Judge Card referred to his experience as a military lawyer. He told the defense attorney that, in the military, spectators often came to court in uniform. The judge also noted that jurors are normally instructed to confine their deliberations to the evidence presented at the trial, not to consider extraneous facts for any purpose, and not to base their verdict on prejudice or sympathy.

Based on all of this, Judge Card declined to prohibit law enforcement officers from attending Phillips's trial in uniform, so long as they were attending in their personal capacity as citizens of the State of Alaska. (Assumedly, officers attending the trial in their official capacity would likewise be allowed to wear their uniform.) Judge Card stated that he would not exclude the officers—indeed, would not exclude anyone—

from the trial, because "the purpose of being here is to have an open trial".

This is how matters stood until the following Monday, January 26th, when Judge Card called both parties into his chambers. A court employee, Debra M. Coleman, had informed Judge Card that, during the weekend, she had overheard one of the jurors talking about the case with a friend while they were in a crowded shower at the gym.

Judge Card put Ms. Coleman under oath and had her describe the conversation she had overheard. Ms. Coleman testified that she overheard the juror tell another woman that she was a juror in the Phillips case and that "there [were] a lot of state patrol officers in the courtroom...."

Based on Coleman's testimony, Judge Card suggested that the juror be called in for questioning. The judge was concerned that the juror might have been "expressing nervousness about officers being in the courtroom", and he wanted to make sure that this was not the case.

In response, the prosecutor suggested that it would be counter-productive to single out this juror. The prosecutor told the court that he had made some telephone phone calls and had learned that "many of the officers that we [saw] were [new] recruits ... who [had] been encouraged by their supervisors ... to come to court and watch, because it's not too often that a quote 'cop killer' ... case goes to trial." The prosecutor then explained that he "[did] not want the jury to get the ... impression that somehow [the State was] packing the courtroom ... with [the] intent to influence the outcome of the case", so he had "asked the right people ... to sort of discontinue" this practice. The prosecutor predicted that the number of uniformed officers attending Phillips's trial would decrease, and he suggested that, by the end of trial, the jurors would look back and "associate the number of officers with the beginning of the trial" and would probably attribute the officers' presence to "curiosity, and coming to court and watching opening statements, and such".

Phillips's attorney agreed with the prosecutor that "singling out [this juror] or [any-]body else might be inappropriate". He therefore did not ask Judge Card to conduct a *voir dire* examination of the juror. Rather, the defense attorney asked Judge Card to issue a "pointed admonition" to the jurors as a group, directing them to refrain from talking to anyone about the case.

The defense attorney also reiterated that he believed the court had the power and the duty to prevent law enforcement spectators from wearing their uniforms. He indicated that he would soon be filing a motion asking the court to bar law enforcement officers from attending the trial in their uniforms. Judge Card stated that he wished to review this motion and the accompanying memorandum of supporting authority before he took any action.

The defense attorney filed his motion that same afternoon. Judge Card heard argument on this motion on the morning of Monday, February 2nd (*i.e.*, the beginning of the third week of trial). The State argued that the defense motion was essentially moot because the number of officers in attendance had dropped dramatically during the second week of trial. But Phillips's attorney disputed that the issue was moot. He asserted that the prejudice to Phillips's case had already occurred—that "people were really struck by the wall of blue in the front row when they walked into this trial" when it opened. Accordingly, the defense attorney asked Judge Card to consider the prejudice that had already occurred during the first week of Phillips's trial, as well as the foreseen prejudicial effect of having a "solid phalanx of blue here in court [during] closing arguments".

Again, Judge Card minimized the defense attorney's concerns. The judge conceded that there were reported cases in which trial judges had been criticized for allowing spectators to openly wear buttons proclaiming their membership in Mothers Against Drunk Driving or Women Against Rape. But the wearing of a police uniform, Judge Card declared, did not "convey a message ... other than justice—which is what we're here for". Thus, Judge Card concluded, the presence of uniformed law enforcement officers

in the spectator section did not pose an "unacceptable risk".

Judge Card stated, however, that he did not want to have "a sea of blue, shoulder-to-shoulder in this courtroom, packing it with forty-nine officers, [leaving] no room for civilians". So, rather than issue the complete ban on uniformed officers that Phillips requested, Judge Card stated that he preferred to set a limit on the number of uniformed officers who could sit in the spectator section. The judge suggested a limit of ten to twenty percent of the courtroom's spectator seating.

(The record indicates that the seating capacity in the spectator section was forty-five people. Thus, under the judge's suggested guideline, five to ten uniformed officers would have been allowed to attend the trial.)

Phillips's attorney responded that twenty percent was "too large . . . a presence of the police". The defense attorney then moved for a mistrial "based on the prejudice that [he] believe[d had] already occurred in the course of this trial".

Judge Card denied the defense motion for a mistrial, but he appeared to offer a new compromise: he stated that he was "leaning towards" a limit of five uniformed officers. In a written order issued later that day, Judge Card did indeed limit the number of police officers in attendance to five—approximately ten percent of the courtroom's spectator seating capacity.

Phillips's trial continued for another three weeks. The case went to the jury on Friday, February 27th, and the jury returned its verdict on Tuesday, March 3rd. The defense attorney never raised this subject again.

*(b) Did the presence of the law enforcement officers prejudice the fairness of Phillips's trial?*

■ On appeal, Phillips argues that law enforcement spectators constituted "an overwhelming and intimidating police presence in the courtroom" and that, accordingly, Judge Card should have granted his motion for a mistrial or at least should have completely barred the presence of uniformed officers in the spectator section.

The United States Supreme Court has observed that "a roomful of uniformed and armed policemen might pose [a threat] to a defendant's chances of receiving a fair trial"[5]—although, in that case, the Supreme Court was referring to the potential inference that a defendant was an especially dangerous criminal who needed extraordinary guarding. Here, the danger was different: Phillips was on trial for murdering a state trooper, and the appearance of law enforcement officers *en masse* in the spectator gallery posed a threat that the jurors would feel implicit pressure to return a verdict favorable to law enforcement interests or sentiment.

Other courts have acknowledged this potential obstacle to a defendant's receiving a fair trial. See *Balfour v. State*, 598 So.2d 731, 756 (Miss.1992), where the court noted the potential "coercive atmosphere" when uniformed police officers sat together in a group during a capital murder trial where the victim was a law enforcement officer.

The potential prejudice associated with the presence of uniformed law enforcement officers during a prosecution for the murder of a police officer is similar to the potential prejudice associated with the presence of other types of spectators at a criminal trial who conspicuously align themselves with the victim's interests. Thus, in *Norris v. Risley*, 918 F.2d 828, 829–30, 831 (9th Cir.1990), the court reversed the defendant's conviction for rape because several members of a local rape task force and the National Organization for Women wore "Women Against Rape" buttons during the trial. In *Woods v. Dugger*, 923 F.2d 1454, 1459–60 (11th Cir.1991), the court reversed a defendant's conviction for the first-degree murder of a corrections officer due, in part, to the "prejudice aris[ing] from the presence of the uniformed corrections officers" in the courtroom. And in *State v. Franklin*, 174 W.Va. 469, 327 S.E.2d 449, 454–55 (1985), the court reversed the defendant's conviction for a homicide arising from drunk driving because, throughout the trial, ten to thirty spectators seated directly in front of the jury wore "Mothers Against

5. *Holbrook v. Flynn*, 475 U.S. 560, 570–71, 106    S.Ct. 1340, 1347, 89 L.Ed.2d 525 (1986).

Drunk Driving" buttons inscribed with the acronym "MADD".

Thus, there is case law to support the defense attorney's objection to the presence of a large group of uniformed law enforcement officers in the spectator gallery at Phillips's trial. But the question in Phillips's appeal is whether the law enforcement presence was so prejudicial that Judge Card abused his discretion when he limited the police presence to five uniformed officers instead of accepting the defense proposal to bar all uniformed officers from attending the trial or, in lieu of that complete bar, granting the defense request for a mistrial.

▰▰▰▰ Generally, a trial judge's decision to grant or deny a motion for mistrial is reviewed for abuse of discretion [6], and we conclude that the same standard of review should govern a mistrial motion based on an allegation of prejudice stemming from the presence of spectators affiliated with one party or another. The trial judge is in the best position to determine the potential effect that the presence of spectators might have on the jurors, and to observe whether these spectators engaged in untoward demonstrations of sentiment or allegiance.

Application of an abuse of discretion standard is somewhat difficult in Phillips's case because it appears that, at least initially, the trial judge did not fully appreciate the risk of prejudice—*i.e.,* the risk of sympathy or intimidation—posed by the presence of a group of uniformed law enforcement officers in the spectator section of the courtroom. Judge Card's analogy to military trials (where spectators often come to court in uniform) was not particularly apt—since, in a military court, the accused, the accuser, and the jurors (and often the victim) are all members of the military. And a defendant accused of killing or assaulting a law enforcement officer might properly be dismayed by the judge's further statement that a police uniform "convey[s no] message other than justice—which is what we're here for".

Nevertheless, both the prosecutor and Judge Card ultimately responded to the defense attorney's concerns. At the beginning of the second week of trial, the prosecutor announced that he "[did] not want the jury to get the ... impression that somehow [the State was] packing the courtroom ... with [the] intent to influence the outcome of the case", so he had "asked the right people ... to ... discontinue" the practice of encouraging law enforcement officers to attend the trial. And at the beginning of the third week of trial, Judge Card issued a ruling that limited the number of uniformed law enforcement spectators to five at any one time.

It is important to note that, when Phillips's attorney asked for the mistrial, he did not assert that these measures had proved, or would prove, ineffective. Rather, the defense attorney argued that irremediable prejudice had *already* occurred, arising from the officers' presence during the first week of trial, and that no remedy short of a mistrial or at least a complete ban on the presence of uniformed officers would cure this prejudice.

But Phillips's trial lasted six weeks. From the record before us, it appears that the law enforcement presence was conspicuous for only the first week of the trial. Moreover, when the defense attorney had the chance to *voir dire* a juror (at the beginning of the second week of trial) to see if the presence of law enforcement spectators was in fact influencing the jury, the defense attorney declined the opportunity. Based on this record, we conclude that Judge Card did not abuse his discretion when he rejected Phillips's request for a mistrial or, alternatively, a complete ban on the presence of uniformed officers, and instead opted for other remedial actions to minimize the risk of prejudice while at the same time accommodating the officers' legitimate interest in attending the trial.

*Potential prejudice arising from the fact that the prosecutor introduced Trooper Heck's widow to the jury at the beginning of the trial*

▰▰▰▰ On the morning of the second day of trial (January 21, 1998), the prosecutor asked

---

6. *Cheely v. State,* 861 P.2d 1168, 1178 (Alaska App.1993); *Gorz v. State,* 749 P.2d 1349, 1355 (Alaska App.1988).

Judge Card for permission to introduce Trooper Heck's widow to the jurors. Phillips objected that there was no reason for such an introduction, other than the prosecutor's desire to generate "as much sympathy and emotion as he can". Judge Card overruled this objection, noting that he had already instructed the jurors that sympathy was to play no part in their decision, and that he intended to do so again at the end of the trial.

The prosecutor then proceeded to introduce Laurie Heck, who was seated in the spectator gallery next to some uniformed officers. But instead of simply introducing Ms. Heck, the prosecutor offered the following explanation of her presence:

> *Prosecutor:* I do want to take a moment this morning ... to introduce ... the members of the jury and ... the court [to] Laurie Heck, who is Bruce Heck's widow. She will be seen from time to time in the court. Actually, she plans to be here every day. She was not here during jury selection. [To Ms. Heck:] Can you stand up?
>
> [Ms. Heck] was not here during jury selection last week: she lives in Glennallen, [and] she was in the process of moving down [here].... But she'll be here every day.

On appeal, Phillips argues that the prosecutor's act of introducing Trooper Heck's widow to the jury was the equivalent of inviting the jurors to step into the shoes of the victim—a prohibited "golden rule" argument.[7] But this contention overstates what happened. The prosecutor did not ask the jurors to do anything or imagine anything.

As the State correctly notes, Ms. Heck (as the surviving spouse of a homicide victim) had a constitutional right to attend all phases of Phillips's trial. *See* Article I, § 24 of the Alaska Constitution and AS 12.61.010(a).[8] Not only would Ms. Heck inevitably have come to the jurors' attention because she was a constant spectator, but she in fact testified during the State's case-in-chief, describing her husband's level of health and state of physical well-being at the time of the homicide. Thus, even if the prosecutor had not been allowed to introduce Ms. Heck to the jurors at the beginning of the trial, she would have become known to the jurors during the trial.

This is not to say that we perceive no problem with the practice of specially introducing crime victims to the jury. The American Bar Association's Standards for the Administration of Criminal Justice suggest that it is unprofessional for a prosecutor to engage in conduct (other than introducing evidence or making fair comment on the evidence) whose primary purpose is to arouse the jurors' passions in a way that will prejudice the jurors' fair consideration of the case.[9]

---

7. *See Beaumaster v. Crandall,* 576 P.2d 988, 994 (Alaska 1978); *Mallonee v. Finch,* 413 P.2d 159, 164 (Alaska 1966) (holding that it is improper for an attorney to implore jurors to put themselves in the position of one of the litigants and then ask themselves what kind of outcome they would wish under the circumstances). For an application of this rule in a criminal case, see *United States v. Teslim,* 869 F.2d 316, 328 (7th Cir.1989) (holding that it is improper for a prosecutor to urge the jury to place themselves in the victim's shoes).

8. Article I, § 24 states in pertinent part: "Crime victims, as defined by law, shall have the following rights as provided by law: ... the right to confer with the prosecution; the right to be treated with dignity, respect, and fairness during all phases of the criminal and juvenile justice process; the right to timely disposition of the case following the arrest of the accused; the right to obtain information about and be allowed to be present at all criminal or juvenile proceed-

ings where the accused has the right to be present; [and] the right to be allowed to be heard, upon request, at sentencing, before or after conviction or juvenile adjudication, and at any proceeding where the accused's release from custody is considered[.]"

See also AS 12.61.010(a), which clarifies that a crime victim has the right to be present at any proceeding where the defendant has the right to be present, "even if the victim is likely to be called as a witness".

Under AS 12.61.900(3), which adopts the definition of "victim" codified in AS 12.55.185(16)(C), if the person against whom the offense was committed is dead, the term "victim" includes "a person living in a spousal relationship with the deceased before the deceased died".

9. See, for instance, Standard 3–5.6, which declares that "[i]t is unprofessional conduct for a prosecutor to permit any tangible evidence to be

There are few cases dealing with the introduction of crime victims to the jury. But in at least one egregious case, this practice prompted an appellate court to reverse a criminal conviction. See *State v. Henry*, 196 La. 217, 198 So. 910 (1940), in which a murder conviction was reversed because the special prosecutor escorted the victim's widow and daughter to seats within ten feet of the jury, then staged an exhibition in which he referred to the widow and daughter as sorrowful, bereaved relatives of the deceased—and later publicly announced that he had adopted these tactics for the purpose of arousing the sympathy of the jury in aid of the state's case. *See also* Kenneth J. Rampino, *"Propriety and Prejudicial Effect of Prosecutor's Remarks as to Victim's Age, Family Circumstances, or the Like"*, 50 A.L.R.3d 8, 1973 WL 33841 (1973).

In the present case, the prosecutor's introduction of Trooper Heck's widow to the jury at the beginning of the trial appears to have had no purpose apart from encouraging the jurors to pay attention to her during the trial because she was the living representative of the deceased. Nevertheless, we take judicial notice that attorneys often engage in acts of attentiveness to their clients for the primary purpose of "humanizing" their clients and thereby evoking the jurors' empathy. Likewise, when litigants take the stand, their attorneys often engage in preliminary questions whose answers have little relevance to the matters being litigated, and whose primary purpose is generate juror empathy by explaining the client's background and the client's situation in life. Such tactics are not normally perceived as prejudicing the fairness of the trial. Indeed, we note that Phillips's attorney responded to the prosecutor's gambit by introducing the members of Phillips's family.

We further note that Judge Card expressly cautioned the jurors not to allow their decision to rest on "mere sentiment, conjecture, sympathy, passion, prejudice, public opinion, or public feeling".

Given this record, we conclude that even if it was error for Judge Card to allow the

prosecutor to specially introduce Laurie Heck at the beginning of Phillips's trial, that error did not prejudice the fairness of the proceedings.

### *The jury instruction on causation*

■ Phillips was indicted for first-degree murder. The State asserted that Phillips intentionally killed Trooper Heck by choking him and smothering him with snow when Heck tried to take Phillips into custody. But Phillips claimed that Heck died by accident—that his death arose from a pre-existing heart condition. Phillips asserted that Heck succumbed to heart arrhythmia brought on by the physical effort of chasing Phillips through the woods.

The evidence on this point was conflicting. The State presented the testimony of Dr. Michael Propst, the state medical examiner, who testified that Heck died from asphyxiation resulting from the combined effect of thorax compression (caused by Phillips's act of straddling Heck's chest), windpipe compression caused by the forceful application of some object (such as Phillips's forearm) across Heck's throat, and smothering that occurred when Phillips covered Heck's face with compressed snow.

Phillips countered this testimony with expert testimony of his own. Phillips's primary expert witness was Dr. Ira Kanfer, a pathologist who testified that Heck's injuries were superficial and inconsistent with the State's theory of death by smothering or strangling. Dr. Kanfer believed that Heck died from heart arrhythmia brought on by Heck's fight with Phillips. Phillips's second expert, Dr. Karen Kelly, agreed with this conclusion. She said that if she were signing Heck's death certificate, she would certify the cause of death as "cardiac arrhythmia elicited during a struggle".

Clearly, the jury had doubts concerning the State's allegation that Phillips intentionally killed Heck, for the jury acquitted Phillips of first-degree (intentional) murder. However, the jury apparently agreed with the State that Phillips killed Heck during a

---

displayed in the view of the … jury which would tend to prejudice fair consideration by the …

jury until such time as a good faith tender of such evidence is made.

struggle that ensued when Heck arrested Phillips in the woods. The jury found Phillips guilty of second-degree (unintentional) murder under three different theories: (1) that Phillips caused Heck's death while acting with intent to cause serious physical injury or knowing that his conduct was substantially certain to cause death or serious physical injury [10]; (2) that Phillips caused Heck's death while acting with extreme indifference to the value of human life [11]; and (3) that Phillips caused Heck's death while committing the crime of second-degree escape (felony murder) [12].

On appeal, Phillips contends that the jury's verdicts are flawed by a mistake in the court's instruction on causation.

Judge Card instructed the jury that "[a] defendant's conduct need not be the sole factor" in producing the result prohibited by the statute (in this case, human death), and that Phillips could properly be convicted if the jury found that his conduct "was a substantial factor in bringing about the [prohibited] result". This was a correct statement of the law.[13]

Judge Card then told the jury:

[A] defendant will be held accountable for an injury or death resulting from his conduct even though it can be shown that the injury or death resulted from the combined effects of the act of the defendant and a pre-existing condition of the person killed. This is true even though it is probable that a person in sound physical condition would not have died from the injury inflicted by the defendant, and even though it is probable that the injury inflicted by the defendant only hastened the death of the person. Once a defendant has set events in motion, no condition of the victim relieves the defendant of criminal responsibility for the ensuing injury or death if the defendant's conduct created or enhanced the risk that someone would suffer the type of injury actually suffered by the victim.

10. AS 11.41.110(a)(1).

11. AS 11.41.110(a)(2).

12. AS 11.41.110(a)(3).

Phillips's attorney objected to this portion of the instruction on the ground that it did not require the jury to find that Heck's death was "a direct, natural, and probable consequence" of Phillips's conduct. But such an instruction would have been wrong, or at least substantially misleading.

If Phillips unlawfully fought with Heck to avoid arrest or to escape following arrest, and if Heck died from the combined effects of this struggle and his pre-existing heart condition, Phillips's conduct would be the cause Heck's death (for purposes of assessing Phillips's guilt of criminal homicide) even if Heck's death was not a "natural and probable consequence" of the sort of struggle that occurred. Under such circumstances, it would be no defense that Heck's death was an unexpected or unlikely consequence of Phillips's conduct. As our supreme court stated in *Armstrong v. State*, 502 P.2d 440, 445 (Alaska 1972), "[t]he fact that [a homicide] victim died from the combined effects of a pre-existing disease or condition and a blow or wound maliciously inflicted by the defendant does not relieve the defendant of [criminal] liability [for the resulting death]." Thus, even if Phillips did not strike or choke Heck in a manner that would endanger his life under normal circumstances, and even if Phillips had no way of knowing that Heck suffered from a heart condition, Phillips would nevertheless be criminally responsible for Heck's death if that death resulted from Phillips's unlawful assault combined with Heck's pre-existing heart condition.

On appeal, Phillips words his argument in a slightly different way. He contends that the quoted language from the jury instruction was flawed because it did not instruct the jury to acquit Phillips of murder (and any lesser degree of criminal homicide) if the jury found that Heck's pre-existing heart condition was an "intervening" or "superseding" cause of Heck's death.

13. *See State v. Malone*, 819 P.2d 34, 36 (Alaska App.1991); Rollin M. Perkins & Ronald N. Boyce, *Criminal Law* (3rd edition 1982), pp. 779–780.

But, as a legal matter, if Phillips assaulted Heck, Heck's pre-existing heart condition could not have been a superseding cause of his death. Once Phillips used unlawful force against Heck, Phillips became responsible for the consequences, even if those consequences were exacerbated by Heck's pre-existing heart condition. As the supreme court stated in *Armstrong*, "the ·consequences of an act which is the efficient cause of the death of another are not excused, nor ·is the [actor's] criminal responsibility for ·causing death lessened, by the pre-existing physical condition of the person killed".[14]

The only area of difficulty would be if the jury doubted whether Phillips used unlawful force against Heck. For instance, if Phillips had simply run away into the woods and Heck had suffered a heart attack while running after him, there would be a significant question as to whether Phillips could be held criminally responsible for Heck's death.

In his brief to this Court, Phillips identifies this problem. He argues that, under the court's instruction on causation, the jury might have believed that Phillips could be found guilty of criminal homicide if he "set events in motion" (the wording of the instruction) simply by running from the overturned cab into the woods, even though he never laid a hand on Trooper Heck.

The challenged portion of the jury instruction is potentially ambiguous or incomplete regarding the question of whether Phillips could properly be held accountable for Heck's death if Phillips's role in causing that death was limited to Phillips's act of fleeing into the woods—an arguably unlawful but non-assaultive act.

But this potential ambiguity or incompleteness in the causation instruction was harmless in the factual context of Phillips's case. Phillips did not merely flee into the woods. Rather, Trooper Heck caught up with Phillips ·and· begán the process of arresting him— as manifested by the fact that there was a handcuff fastened to Phillips's left wrist when he was taken into custody by Trooper Pierce. There was further evidence that Phillips used

unlawful force on Heck: in the area surrounding Heck's body, the snow was trampled down as if there had been struggle, and a great deal of Phillips's blood was found in the immediate area. (Phillips was bleeding from wounds suffered when he drove the cab off the road.)

Both of the defense expert witnesses testified that Heck died from. heart arrhythmia brought on by a physical struggle. And the defense attorney, in his summation, conceded to the jurors "that Mr. Phillips and Trooper Heck [engaged] in a struggle".

Moreover, the jury's three second-degree murder verdicts demonstrate their conclusion that Phillips did more than simply run into the woods—that he in fact used unlawful force against Heck.

The jurors found Phillips guilty of second-degree murder under a felony-murder theory. That is, they concluded that Phillips caused Heck's death while committing second-degree escape. This verdict required the preliminary finding that Heck had placed Phillips under arrest and, according to the jury instruction on felony murder, it also required the jurors to find that Phillips "caused the death of ... Trooper Bruce Heck" "in the course of or in furtherance of [the escape], or in immediate flight from that crime".

The jurors also convicted Phillips of second-degree murder under the theory that he caused Trooper Heck's death "under circumstances manifesting an extreme indifference to the value of human life". It is extremely unlikely that the jurors would have viewed Phillips's act of running from the overturned cab as conduct that manifested extreme indifference to the value of human life.

Finally, the jurors convicted Phillips of second-degree murder under the theory that, acting with the intent to inflict serious physical injury, or knowing that his conduct was substantially certain to cause death or serious physical injury, he caused Heck's death. Again, it is extremely unlikely that the jurors

**14.** *Id.* at 445, quoting Anderson, *Wharton's Criminal Law and Procedure* (1957), § 201, Vol. 1, pp. 450–55.

would have viewed Phillips's act of running from the overturned cab as conduct that was intended to inflict serious physical injury, or as conduct that was substantially certain to cause death or serious physical injury. The jurors must have concluded that Phillips assaulted Heck in the woods, and that this assault was a substantial factor in causing Heck's death.

For these reasons, we conclude that any arguable ambiguity or incompleteness in the causation instruction was harmless beyond a reasonable doubt under the facts of Phillips's case and given the way his case was litigated (*i.e.*, the defense concession that Phillips struggled against Heck).

### Phillips's sentence

■ Phillips was convicted of second-degree murder, an unclassified felony that carried a penalty of 5 to 99 years' imprisonment at the time of Phillips's offense.[15] (The penalty range is now 10 to 99 years.)[16] Judge Card found that Phillips was a worst offender, and he sentenced Phillips to the maximum sentence: 99 years' imprisonment.

Phillips was also convicted of two counts of first-degree robbery, a class A felony with a maximum penalty of 20 years' imprisonment.[17] Based on his prior felony convictions, Phillips was a "third felony offender" for presumptive sentencing purposes, and he therefore faced a presumptive term of 15 years' imprisonment on each count of robbery.[18] With regard to these two counts of robbery (one count for each victim, Roberto Cuautle and his daughter, Liliana Hernández), Judge Card again found that Phillips was a worst offender, and he sentenced Phillips to a composite term of 25 years' imprisonment, consecutive to the murder sentence.

Additionally, Phillips was convicted of two counts of second-degree assault against Cuautle and Hernández. Second-degree as-

sault is a class B felony with a maximum sentence of 10 years' imprisonment.[19] As a third felony offender, Phillips faced presumptive terms of 6 years' imprisonment for these crimes.[20] Judge Card sentenced Phillips to a composite term of 14 years' imprisonment, consecutive to the murder sentence and the robbery sentences.

Judge Card also imposed a total of 8 years with 4 years' imprisonment for Phillips's other offenses: second-degree escape and first-degree vehicle theft.

All told, Phillips received a composite sentence of 142 years to serve.

On appeal, Phillips challenges this sentence as excessive. He contends that his second-degree murder sentence should have been within the 20–to 30–year benchmark range established by this Court in *Page v. State*, 657 P.2d 850, 855 (Alaska App.1983). Phillips concedes that he could properly receive additional time to serve for the robberies, but he argues that his composite sentence for all of these crimes should not have exceeded 40 years to serve.

The *Page* benchmark sentencing range was intended to demarcate the range of actual imprisonment ("time to serve") that a sentencing judge should impose on a typical first felony offender convicted of a typical second-degree murder.[21] Phillips is not a typical first felony offender. He is a third felony offender, and his status is further aggravated by the fact that he committed this murder just two days after being released from prison on felony parole.[22] These facts, standing alone, would justify a murder sentence above the *Page* benchmark range.

In addition, it was proper for Judge Card to conclude that Phillips's crime was aggravated because the victim was a law enforcement officer engaged in his duties. Compare

**15.** AS 11.41.110(b); AS 12.55.125(b) (1998 version).

**16.** *See* SLA 1999, ch. 65, § 1.

**17.** AS 11.41.500(b); AS 12.55.125(c).

**18.** AS 12.55.125(c)(4).

**19.** AS 11.41.210(b); AS 12.55.125(d).

**20.** AS 12.55.125(d)(2).

**21.** *See Brown v. State*, 4 P.3d 961, 964 (Alaska App.2000); *Sam v. State*, 842 P.2d 596, 603 (Alaska App.1992).

**22.** *See* AS 12.55.155(c)(20).

AS 12.55.125(c)(2), which imposes a more severe presumptive term on first felony offenders convicted of class A felonies if their offense was "knowingly directed [toward] a uniformed or otherwise clearly identified peace officer ... who was engaged in the performance of official duties at the time of the offense".

However, we are troubled by one aspect of Judge Card's sentencing remarks. When Judge Card was explaining the reasons why he believed that Phillips should receive a sentence above the *Page* benchmark range, the judge referred to—and misapplied—our decision in *Gustafson v. State*, 854 P.2d 751 (Alaska App.1993).

In *Gustafson*, we were asked to reconcile the *Page* benchmark (20 to 30 years to serve) with a statement we made in *State v. Krieger*, 731 P.2d 592 (Alaska App.1987), that "[when] a homicide is unintentional, [past] appellate [decisions] indicate that ... a sentence of ten years or less is sufficient to satisfy the *Chaney* [sentencing] criteria." [23]

The defendant in *Gustafson* argued that, given this statement in *Krieger*, any second-degree murder defendant who did not intend to kill their victim should receive a sentence below the *Page* benchmark. We rejected this argument because, by definition, *all* second-degree murders are unintended homicides.[24] Thus, it would be inconsistent with *Page* if we limited sentences to 10 years to serve whenever the death was unintended. Instead, we declared that the statement in *Krieger* referred to homicides caused by non-assaultive conduct or "unintentional assaults" (since the Alaska criminal code now contains various types of reckless and negligent assaults).[25]

(Since that time, we have also rejected the suggestion in *Krieger* that the *Chaney* crite-

ria will always be satisfied by a sentence of 10 years or less to serve for second-degree murder stemming from an unintentional assault. *Krieger's* 10–year ceiling was based on the Alaska Supreme Court's decision in *Pears v. State*[26], which was interpreted as setting a 10–year ceiling on sentences for vehicular homicide, even when the defendant was convicted of second-degree murder.[27] But later, in *State v. Bumpus*, the supreme court disavowed this interpretation of *Pears*.[28] Accordingly, this Court has upheld sentences exceeding 10 years to serve for second-degree murder arising from an unintentional assault.[29])

Our decision in *Gustafson* clarified that, despite what was said in *Krieger*, Page continues to supply the benchmark sentencing range for second-degree murders arising from intentional assaults. But Judge Card's sentencing remarks suggest that he misunderstood our holding in *Gustafson*. Instead of construing *Gustafson* to mean that *Page* continued to supply the benchmark range for second-degree murders arising from intentional assaults, Judge Card interpreted *Gustafson* to mean that any second-degree murder arising from an intentional assault must be among the most serious second-degree murders, an offense equivalent in blameworthiness to first-degree murder:

> *The Court:* I looked at the *Gustafson* case, ... which says that killing is intentional if it [arises] from an intentional assault. In [Phillips's] case, [his] fighting with the officer was an intentional assault. It was [his] intention to get away from the trooper, [so] he intentionally assaulted the trooper. That effectively makes this [killing] an intentional act as opposed to a reckless [or] a grossly negligent [act], or

---

23. *Krieger*, 731 P.2d at 595, referring to *State v. Chaney*, 477 P.2d 441, 443–44 (Alaska 1970).

24. *Gustafson*, 854 P.2d at 765–66; AS 11.41.110(a).

25. *Gustafson*, 854 P.2d at 766.

26. 698 P.2d 1198, 1205 n. 15 (Alaska 1985).

27. *See Krieger*, 731 P.2d at 595.

28. 820 P.2d 298, 302 (Alaska 1991).

29. For example, in *Puzewicz v. State*, 856 P.2d 1178 (Alaska App.1993), we upheld a sentence of 13 years to serve for second-degree murder stemming from a motor vehicle accident. See also *Pusich v. State*, 907 P.2d 29 (Alaska App.1995), where we upheld a sentence of 18 years to serve for manslaughter and first-degree assault arising from a motor vehicle accident.

any other terms we use for [culpable] mental states.

> The [second-degree] murder ... in this case is more closely akin to murder in the first degree, because of the *Gustafson* logic, in that Mr. Phillips intentionally—as that term is used in *Gustafson*—intentionally did acts which caused the death of Trooper Heck, and it was totally without provocation.

This reasoning stands the *Gustafson* decision on its head. *Gustafson* acknowledges that second-degree murders stemming from non-assaultive conduct are typically among the least serious; but *Gustafson* does not say that second-degree murders stemming from intentional assaults are necessarily among the most serious.

Judge Card's interpretation of *Gustafson* would render the category of "typical" second-degree murders a null set—for this category would include neither intentional nor unintentional assaults. Moreover, such an interpretation of *Gustafson* would be fundamentally at odds with the definition of second-degree murder. Under AS 11.41.110(a)(1), a person commits second-degree murder if they unintentionally kill another person while committing an assault whose purpose is to inflict serious physical injury. That is, assaultive conduct is a required element of the offense under this subsection of the statute—so, logically, this same assaultive conduct can not, *per se*, automatically constitute the most serious conduct within the definition of the offense.

In Phillips's case, the jury found that Trooper Heck met his death because Phillips intentionally assaulted the trooper and, when doing so, Phillips either intended to seriously injure the trooper or he knew that his assault was substantially certain to cause death or serious physical injury to the trooper. But, as just explained, this is the basic definition of the offense under subsection (a)(1) of the second-degree murder statute. Judge Card was wrong when he concluded that Phillips's intentional assault on Trooper Heck meant that the resulting homicide was automatically equivalent in blameworthiness to first-degree murder, or that Phillips should presumptive-

ly receive the 99–year maximum sentence for second-degree murder.

Because of this, we vacate Phillips's sentence for second-degree murder and we direct Judge Card to reconsider that sentence.

*Conclusion*

For the reasons explained above, we AFFIRM Phillips's convictions for murder, escape, robbery, assault, and vehicle theft.

(We do, however, direct Judge Card to amend the written judgement so that it reflects a single conviction for second-degree murder based on the jury's three second-degree murder verdicts. Phillips can not lawfully be convicted of more than one murder for killing a single victim.)

We VACATE Phillips's sentence for second-degree murder, and we direct Judge Card to re-sentence Phillips in accordance with the explanation of *Gustafson* contained in this opinion. The re-sentencing should occur within 90 days of the issuance of this opinion.

When Judge Card has re-sentenced Phillips, he shall notify this Court. At that point, Phillips shall notify this Court whether he intends to renew his claim that his composite sentence is excessive. If Phillips wishes to continue his sentence appeal, the Clerk's Office shall order preparation of a transcript of the re-sentencing hearing.

Upon certification of this supplemental transcript, Phillips shall have 30 days to file a supplemental sentencing brief (which can be filed in memorandum form). The State shall have 30 days thereafter to file its own supplemental sentencing brief. When we have received these briefs, we shall resume our consideration of Phillips's sentence appeal.

We retain jurisdiction of this appeal.